Diane K. HEFFERMAN,
Plaintiff–Appellant/Cross–Appellee,

v.

Bernadette Y. BITTON; Nathan Bitton;
Edward F. Reid,
Defendants–Appellants,

and

Bernard F. Brill,
Defendant–Appellee/Cross–Appellant.

Nos. 88–2989, 88–15094.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 5, 1989.

Decided Aug. 9, 1989.

Richard C. Lewis, Walnut Creek, Cal., for plaintiff-appellant/cross-appellee.

Robert A. Goldstein, Oakland, Cal., for defendant-appellee/cross-appellant.

Before SNEED, ALARCON and LEAVY, Circuit Judges.

SNEED, Circuit Judge:

The district court below ordered lender Bernard Brill to pay consumer Diane K. Hefferman a $1000 civil penalty plus costs and attorney's fees for failing to comply with the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601–1667e (1982 & Supp. V 1987). Hefferman, dissatisfied with the civil penalty, appeals from the court's refusal to order Brill to refund the interest and loan costs that she has paid him. Brill cross-appeals from the judgment against him and the denial of attorney's fees. Lenders Edward F. Reid, Bernadette Y. Bitton, and Nathan Bitton, whom the court dismissed as defendants, also cross-appeal from the denial of attorney's fees. We affirm the district court's refusal to award additional relief to Hefferman, reverse its judgment against Brill, and affirm its denials of attorney's fees.

## I.

### FACTS AND PROCEEDINGS BELOW

On September 24, 1984, Brill, Reid, and the Bittons loaned Hefferman $22,000 in exchange for three notes secured by a single deed of trust on Hefferman's condominium in Walnut Creek, California. Hefferman promised in the notes to repay $3080 to Brill, $7920 to Reid, and $11,000 to the Bittons at sixteen percent interest in twenty-three installments due each month from November 1, 1984, to October 1, 1986, with a single balloon payment afterwards. Before giving her the money, the lenders withheld $2,200 for a broker's fee (finance charge) and $297 for title insurance, escrow fees, and recording fees. Hefferman, and

the third parties to whom she assigned the money, thus received a total of $19,503. She used $389.77 of this amount for her first installment payment.

The lenders provided Hefferman with a one-page "Federal Truth–in–Lending Disclosure Statement" patterned closely on model forms published by the Federal Reserve Board. The disclosure statement contained two apparent inconsistencies that the parties did not notice immediately. First, the lenders listed the "Amount Financed" as $19,800 at the top of the form but as $22,000 at the bottom of the form. Second, they stated the "Total of Payments" as $29,040.01, but included a payment schedule revealing that Hefferman, in fact, would pay $29,136.36, a difference of $96.35. The lenders also provided Hefferman with a notice describing her limited rights to cancel the loan under TILA.

On February 27, 1986, Hefferman contracted to sell her condominium, free of existing deeds of trust, to Mr. and Mrs. Malcolm. Their agreement contemplated that the conveyance would take place in an escrow transaction scheduled for April 30, 1986. On April 25, 1986, Hefferman sent a letter to Brill, Reid, and the Bittons informing them of the sale, indicating that she was rescinding their loan pursuant to her rights under TILA, and asking them to remove all demands for unpaid interest and other charges. When the escrow agent closed the transaction on April 30, however, he paid the lenders $24,064.89 to satisfy their claims for principal, interest, late charges, default charges, and reconveyance fees. This payment brought the amount that Hefferman had paid to them to a total of $29,182.67. This figure included a net amount of $9,679.67 in interest and loan costs above the principal that she originally had received (*i.e.*, $29,182.67—$19,503 = $9,679.67).

On April 30, 1987, Hefferman sued the lenders in the United States district court claiming that she had a right to rescind the loan because the lenders had failed to make "material disclosures" mandated by TILA. The court dismissed Reid and the Bittons because they had not made enough loans

within the preceding year to subject themselves to TILA's requirements, *see id.* 15 U.S.C. § 1602(f) (1982); 12 C.F.R. § 226.2 (1988), but partially agreed with Hefferman's claim against Brill. It held that Brill had not satisfied his duty to disclose the amount financed and the total of payments, but ruled that Hefferman had forfeited her right to rescind the loan by selling her condominium. (The court also asserted, in dictum, that it could not require Brill to refund the entire $9,679.67 of interest and loan costs, even if it granted rescission, because he had contributed only $3080, or fourteen percent of the $22,000 loan.) The court nevertheless ordered Brill to pay Hefferman a $1000 civil penalty plus attorney's fees under 15 U.S.C. § 1640(a) for failing to comply with the requirements of TILA. Hefferman appealed and the lenders, to whom the court denied attorney's fees, cross-appealed.

## II.

## JURISDICTION

The district court had federal question jurisdiction under 28 U.S.C. § 1331 (1982). This court has jurisdiction under § 1291.

## III.

## STANDARD OF REVIEW

The parties do not dispute the facts. This court must review issues of law de novo. *See United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

## IV.

## TILA'S DISCLOSURE REQUIREMENTS

We begin by determining whether Brill violated TILA's elaborate disclosure requirements. We conclude that he did not.

A. *Amount Financed*

■ Section 1638(a)(2)(A) provides that creditors making closed-end loans must disclose:

The "amount financed", using that term, which shall be the amount of credit of which the consumer has actual use. This amount shall be computed as follows ...:

(i) take the principal amount of the loan ...;

(ii) add any charges which are not part of the finance charge or the principal amount of the loan and which are financed by the consumer, including the cost of any items excluded from the finance charge pursuant to section 1605 of this title [such as insurance, escrow fees, and recording fees]; and

(iii) subtract any charges which are part of the finance charge which ... have been withheld from the proceeds of the credit.

The $19,800 figure at the top of the lenders' disclosure statement complies with the requirements of this section. The principal amount ($22,000), plus the charges financed by Hefferman which are not part of the finance change or principal ($0), minus the finance charge withheld from the proceeds of the credit ($2,200), equals $19,800.

Section 1638(a)(2)(B) enables creditors to clarify the calculation of the amount financed through an itemization. It states:

[T]he creditor shall provide, at the time other disclosures are required to be furnished, a written itemization of the amount financed. For the purposes of this subparagraph, "itemization of the amount financed" means a disclosure of the following items, to the extent applicable:

(i) the amount that is or will be paid directly to the consumer;

(ii) the amount that is or will be credited to the consumer's account to discharge obligations owed to the creditor;

(iii) each amount that is or will be paid to third persons by the creditor on the consumer's behalf, together with an identification of or reference to the third person; and

(iv) the total amount of any charges described in [§ 1638(a)(2)(A)(iii)].

The lenders provided an itemization on the one-page disclosure statement pursuant to this provision. The itemization satisfies (i)

by showing that the lenders paid Hefferman $10,941.28 directly. It satisfies (ii) by stating a credit of $389.77 for the first payment on the loan. It satisfies (iii) by listing individual charges of $297 for title insurance, escrow fees and recorder fees, $4279.77 for taxes, $1,699.18 for "Central Bank," and $2,193.00 for "PMBIc." Finally, it satisfies (iv) by listing $2,200 as a finance charge.

The lenders, therefore, correctly stated the amount financed and they correctly itemized it. A problem arose only when they decided to use the official sample format for the itemization that the Federal Reserve Board has provided in 12 C.F.R. pt. 226, app. H, at H-3 (1988). This sample format includes a line, immediately above the itemization figures, reading "Itemization of the Amount Financed of $___." The lenders copied this line onto his disclosure statement but had difficulty filling in the blank space. Although the amount financed technically was $19,800, the itemization added up to $22,000. The difference in the figures stems from a distinction made by the statute; section 1638(a)(2)(B)(iv) requires the lenders to include the $2,200 finance charge in the itemization but § 1638(a)(2)(A)(iii) instructed them to omit it in calculating the amount financed.

The lenders, admittedly, created some confusion by placing $22,000 in the sample format's blank space because they made the disclosure statement inconsistent. But some confusion was unavoidable. Stating $19,800 in the space also would have created confusion because it would not comport with the itemization. In the past, we always have required lenders to comply strictly and completely with all of TILA's requirements. See Semar v. Platte Valley Fed. Sav. & Loan Ass'n, 791 F.2d 699, 704 (9th Cir.1986). Yet, it makes no sense to convert TILA from a shield protecting consumers into a sword allowing them to strike lenders who have followed the statute and its regulations as closely as logic

permits. See Jackson v. Grant, 876 F.2d 764, 768 (9th Cir.1989) (Trott, J., dissenting). We thus decline to find an error in the lenders' disclosure of the amount financed.[1]

B. *Total of Payments*

██ Brill explains that the $96.35 between the "stated" total of payments and the "actual" total of payments arose because the lenders treated the twenty-three installment payments as though they all were for equal amounts when, in fact, the first installment payment ($389.77) exceeded the amount of each of the subsequent payments ($293.33) by $96.44. (Brill has offered no explanation for the trivial nine cent difference between $96.44 and $96.35 and we assume it has no material significance.) He argues, however, that the understatement did not violate TILA because a federal regulation provides:

In making calculations and disclosures, the creditor may disregard any irregularity in the first period that falls within the limits described below and any payment schedule irregularity that results from the irregular first period:

. . . . .

(ii) For transactions in which the term is at least 1 year, . . . a first period not more than 11 days shorter or 21 days longer than a regular period;

. . . .

12 C.F.R. § 226.17(4) (1988); see 15 U.S.C. § 1638(a)(5) (mandating disclosure of the total of payments). He notes that the amount of the first installment exceeded the amounts of the other installments because it covered a period of one month and seven days instead of one month exactly. He maintains that the regulation, accordingly, permitted the lenders to overlook its irregular size in calculating the total of payments.

Hefferman responds in two ways. First, she argues that $96.35 exceeds the margin

---

**1.** To hold otherwise would mean that only by filing two statements, one using the $22,000 figure as the amount financed and the other the $19,800 figure, together with a note of explanation, could the lender hope to deflect the borrower's sword. Even this might fail because it could be argued that complexity obscured truth.

of tolerable error established in a footnote to another regulation, which states: "The finance charge shall be considered accurate if it is ... not more than $10 above or below the exact finance charge in a transaction involving an amount financed of more than $1000." 12 C.F.R. § 226.18(d) n. 41. Her argument fails, however, because the footnote does not address the total of payments and does not say that other regulations cannot excuse larger differences.

Second, Hefferman asserts that the provision quoted by Brill applies "only for the purposes of computing the annual percentage rate, obviously." This argument also fails. Although § 266.17(4) should apply to the calculation of such rates, nothing suggests that it does not apply to the calculation of the total of payments.

### C. *Conclusion*

We conclude that, despite the peculiarities in the disclosure statement, Hefferman has failed to convince us to hold Brill liable for violating any of TILA's disclosure requirements. Although she asserts in her answering and reply brief that the disclosure statement contains errors other than those discussed above, she has not described these errors and she has not appealed the district court's rejection of them. We therefore cannot consider them. We conclude that Hefferman had no right to rescission and we reverse the district court's award to Hefferman of the civil penalty, attorney's fees, and costs.

### V.

### TIMING OF THE RESCISSION

 Even if it be assumed that the disclosure statement contained errors, we agree with the district court's conclusion that Hefferman acted too late to rescind. Hefferman relies on TILA's so-called "buyer's remorse" provision, 15 U.S.C. § 1635 (1982), which allows a consumer three business days, without penalty, to rescind any credit transaction that uses his principal home as security. *See Semar*, 791 F.2d at 701–02. The consumer exercises his right to rescind under this provision simply "by

notifying the creditor, in accordance with regulations of [the Federal Reserve] Board, of his intention to do so." 15 U.S.C. § 1635(a).

To ensure that the consumer does not let his rights slip away before he has full knowledge of the transaction, the statute delays the beginning of the rescission period until the creditor delivers a statement containing the material disclosures, such as the amount financed and the total of payments. *See id.* If the creditor never delivers such a statement, the consumer has a continuing right to rescind until "three years after the date of consummation of the transaction or ... the sale of the property, whichever occurs first...." *Id.* § 1635(f); *see Jackson*, 876 F.2d at 765–67 (holding that the right to rescind continued when the creditor did not make required disclosures); *King v. California*, 784 F.2d 910, 913 (9th Cir.1986), *cert. denied*, 484 U.S. 802, 108 S.Ct. 47, 98 L.Ed.2d 11 (1987) (holding that § 1635(f) barred a rescission attempted more than three years after the completion of a transaction). The district court ruled that this provision excluded relief for Hefferman because she had to sue for rescission before she sold her property. The court also reasoned that she had nothing left to rescind after selling her property and paying the lenders.

Hefferman disagrees with the district court on essentially two points. First, she believes that § 1635(f) sets a deadline for sending a lender a notice of rescission, not for bringing an action against a lender in court. She contends that she met this deadline by sending a notice to Brill prior to the escrow closing. Second, she believes that, even though she has sold the property, the court still could give her meaningful relief by ordering Brill to return to her all of the interest and loan costs that she has paid. As noted above, this equals $9,679.67.

Hefferman's contentions implicate a number of complex issues which we will not address. We nonetheless can and do reject her argument. Even if § 1635(f) were interpreted to refer only to the time at which a consumer must notify a lender

of his intention to rescind, a proposition we need not decide, we hold that Hefferman should have sent the notice before contracting to sell her property. Although we have found no precedent on the issue, we believe that the "sale" that § 1635(f) establishes as a deadline (whether for sending a notice or bringing a lawsuit) occurs at this time, and not at the time of the ultimate conveyance.

Congress probably enacted § 1635(f) because it worried that allowing a consumer to rescind after selling his residence would cloud property titles and inhibit transactions. *See* Federal Reserve Board, *Annual Report to Congress on Truth in Lending for the Year 1972, reprinted in* 119 Cong. Rec. 4596, 4597 (1983) (discussing the policies behind § 1635(f)). Terminating the right to rescind when the consumer irrevocably agrees to sell his property fulfills this policy better than terminating the right upon the actual conveyance. Allowing consumers to rescind or attempt to rescind after entering such a contract implicates the rights of the purchaser and his financing agency and could produce needless litigation and other difficulties. Although Hefferman may have concealed the attempted rescission from the Malcolms, or informed them of her intentions but assuaged their doubts by paying the lenders in full at the conveyance, some sellers might attempt to extract an advantage from their buyers. By threatening to rescind, for example, they might attempt to impede, delay, or abort a sale or to exact tribute from a buyer who worries that the original creditor, if not paid, may demand payment at a later date, a possibility that might cause the buyer's banker to withdraw his loan commitment. If the cutoff for rescission occurs upon the contract to sell, however, these possibilities will be eliminated and all buyers will know exactly what they are facing.

## VI.

### ATTORNEY'S FEES

■ We turn, finally, to the lenders' claim that they should receive attorney's fees because the three notes made by Hefferman say: "If action be instituted on this note the undersigned promise[s] to pay such sum as the Court may fix as attorney's fees." We reject this argument because no one has instituted an action on the notes. Although several state court cases have awarded attorney's fees to lenders who have defended TILA counterclaims when suing on their notes, *see, e.g., Mortgage Mint Corp. v. Morgan,* 76 Or.App. 174, 178–79, 708 P.2d 1177, 1180 (1985); *Hayer v. National Bank of Alaska,* 619 P.2d 474, 476–77 (Alaska 1980), these cases differ from the case at hand. The lenders have not sued on Hefferman's notes; indeed, they cannot sue on the notes because Hefferman has paid them. Whether such suits would conflict with federal policy or not, the parties did not contemplate them in their contract. We, therefore, decline to award attorney fees.

AFFIRMED IN PART and REVERSED IN PART.