**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

KIELAN BRETT FRANKLIN,
*Defendant-Appellant.*

No. 20-30136

D.C. No.
6:19-cr-00006-SEH-1

OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted May 4, 2021
Seattle, Washington

Filed November 23, 2021

Before: Danny J. Boggs,[*] Marsha S. Berzon, and
Mary H. Murguia, Circuit Judges.

Opinion by Judge Boggs;
Concurrence by Judge Berzon

## SUMMARY[*]

### Criminal

The panel affirmed a criminal judgment in a case in which Kielan Frankin pleaded guilty to aiding and abetting the possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)–(ii) and 2, and robbery affecting interstate commerce (Hobbs Act robbery) in violation of 18 U.S.C. § 1951(a).

The panel wrote that, as Franklin conceded, binding precedent forecloses his contention that Hobbs Act robbery is not categorically a crime of violence under 18 U.S.C. § 924(c)(3)(A).

Franklin contended that the district court violated his due-process rights at sentencing by relying on his codefendants' unsworn hearsay statements, which accused him of trying to influence their testimony, in imposing an obstruction-of-justice enhancement. As this court had not clearly enunciated the standard for reviewing a district court's determination of whether coconspirator hearsay is unreliable, the panel took the opportunity to clarify it. After examining the development of the minimal-indicia-of-reliability doctrine over the last half-century, the panel concluded that there are two distinct questions that this court answers in examining a hearsay statement at sentencing: (1) whether the statement is "procedurally reliable" and (2) whether the statement is "substantively reliable." If the court answers either question in the affirmative, then the

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

statement may be considered at sentencing. The panel wrote that a determination of procedural reliability—that the hearsay in question does not put the burden on the defendant to prove a negative and that the defendant has adequate opportunity to confront corroborative evidence of the hearsay—is an essentially legal question reviewed de novo. A determination of substantive reliability—whether hearsay statements admitted at sentencing are from reliable sources or are consistent enough with one another to indicate their probable truth—is an essentially factual question reviewed for clear error. The panel wrote that this is a disjunctive test: so long as each hearsay statement offered by the government at sentencing is either procedurally reliable or substantively reliable, due process is not offended.

The panel applied that framework to this case. Reviewing procedural reliability de novo, the panel concluded that the government provided enough specifics so that Franklin was not put to the burden of proving that the enhancement did not apply, and that there were adequate procedural opportunities for Franklin to challenge the extrinsic, nonhearsay evidence corroborating codefendant Gerald Hiler's hearsay statements. Perceiving no error in the district court's conclusion that this evidence sufficiently corroborated Hiler's statements, the panel concluded that the admission of those statements at sentencing did not deprive Franklin of due process. As to substantive reliability, the panel considered the government's argument that Hiler's and codefendant Morgan Pitsch's hearsay statements corroborate *each other* enough to be admissible at sentencing. The panel concluded that the district court did not clearly err in implicitly finding the two coconspirators' statements to corroborate each other enough to be substantively reliable, and that their admission at sentencing thus did not violate due process.

Judge Berzon concurred in the judgment, agreeing that the district court did not err in relying on hearsay statements from Hiler and Pitsch as the basis for an obstruction-of-justice enhancement. She disagreed that this court has developed a disjunctive test under which a hearsay statement may form the basis of a defendant's sentence if it is either "procedurally reliable" or "substantively reliable." She reads this court's cases as requiring, at a minimum, substantive reliability.

**COUNSEL**

Dwight J. Schulte (argued), Schulte Law Firm P.C., Missoula, Montana, for Defendant-Appellant.

Timothy J. Racicot (argued) and Julie R. Patten, Assistant United States Attorneys; Leif M. Johnson, Acting United States Attorney; United States Attorney's Office, Billings, Montana; for Plaintiff-Appellee.

**OPINION**

BOGGS, Circuit Judge:

Kielan Franklin pleaded guilty to one count of aiding and abetting the possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)–(ii) and 2, and one count of robbery affecting interstate commerce (also called "Hobbs Act robbery"), in violation of 18 U.S.C. § 1951(a). Appealing his conviction on the firearm charge, he argues that Hobbs Act robbery is not categorically a crime of violence under 18 U.S.C.

§ 924(c)(3)(A). He also appeals his sentence, contending that the district court relied on hearsay evidence so lacking in indicia of reliability that the court violated his due-process rights. Exercising jurisdiction under 18 U.S.C. § 3742(a)(1) and 28 U.S.C. § 1291, we affirm.

## I.  Background

### A.  Events Leading Up to the Robbery

Kielan Franklin and Arielle Cowser were an unmarried couple who had one child together. They both used heroin. While living in Helena, Montana, they developed a relationship with B.G. and S.G. (the "victims"), a married couple who also used heroin.

In March 2019, Mr. Franklin gave the victims $1,200 to go to Spokane, Washington, and buy an "ounce," meaning twenty-four grams, of heroin.[1] But the price of heroin had increased, and the money would buy only twenty grams. During the trip, Mr. Franklin and Ms. Cowser frequently texted and called the victims using Ms. Cowser's phone to get status updates, but—losing patience—the victims eventually stopped responding. It took longer than Mr. Franklin had expected for the victims to return from Spokane, partially because of heavy snow and partially because B.G. had a habit of doing tasks slowly. The victims also testified that they had sampled some of the heroin before their return. When the victims finally returned, B.G., believing he was eight grams shy of an ounce, tried to "cut" the heroin—that is, add sugar to it—to make twenty-eight

---

[1] We note that, although a customary American ounce converts to about 28.35 grams in the metric system, an "ounce" apparently means only 24 grams in the heroin trade.

grams. B.G. had little experience in cutting heroin and did a poor job of it.

Already upset by the victims' lack of communication, Mr. Franklin went to the victims' house; Ms. Cowser went with him. Mr. Franklin became even more upset after he found that the quality of the heroin was much worse than he had expected—heavily diluted and poorly blended with the sugar. Mr. Franklin told the victims that they owed him double his money back. After leaving, Mr. Franklin continued to text the victims, his messages becoming increasingly threatening.

## B.  The Robbery[2]

On the morning of March 8, 2019, Mr. Franklin, Ms. Cowser, and Gerald Hiler and Morgan Pitsch (the two other codefendants in this case) were at the house of Corissa Soltis. At some point, Mr. Franklin and Ms. Cowser had texted Mr. Hiler "about going out and making a collection on these people." Mr. Franklin, still upset about the missing heroin and money, asked Mr. Pitsch to "go over to a house with him" to get either the drugs or the money. The four left Ms. Soltis's house in Mr. Franklin's Jeep.

While they drove, Mr. Franklin told the other three his plan to rob the victims. Ms. Cowser's job was to enter the victims' house first and leave the door unlocked for the other three. Mr. Hiler was armed with a silver handgun, and he was to act as the "muscle," the most aggressive of the three.

---

[2] We recount the facts as presented by the government. Ms. Cowser presented a different version of these events at trial in her case. We resolve Ms. Cowser's appeal in a memorandum filed simultaneously with this opinion. *United States v. Cowser*, No. 20-30131 (9th Cir. Nov 23, 2021).

Mr. Pitsch was armed with both an aluminum baseball bat and a black pistol that Mr. Franklin had given him.

The group dropped Ms. Cowser off outside the victims' house. Ms. Cowser lied to the victims, saying that she and Mr. Franklin had been fighting and that he had left her "in the middle of nowhere" on the frigid, snowy night. Over B.G.'s protest, S.G. let Ms. Cowser inside. A few minutes later, on their security cameras, the victims noticed someone outside. Ms. Cowser approached the front door, and B.G. told her: "Don't open the door." Before the victims could stop her, Ms. Cowser had let in Mr. Franklin, Mr. Hiler, and Mr. Pitsch.

Ms. Cowser told the three men that the drugs were upstairs and advised them to make sure that the victims did not have their phones. Even so, S.G. discreetly called 911 with a cell phone that she hid under a blanket. During the robbery, she made statements such as "I'm really, really scared" to alert the operator about what was happening. Eventually, Mr. Hiler found the phone and hung up the call. The four defendants decided to make a quick getaway with a small amount of the victims' property—S.G.'s wedding rings, her phone, a purse, about $100, and about a gram of heroin.

## C.  Proceedings Below

Mr. Franklin and Ms. Cowser were each charged with one count of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); one count of Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951(a), 2; and one count of possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A), 2. Mr. Hiler and Mr. Pitsch were also charged in connection with the robbery. The grand jury also alleged that the firearm

in the third count had been brandished. If proved at trial, that fact would subject each defendant to a mandatory minimum sentence of seven years consecutive to any other sentence imposed. 18 U.S.C. § 924(c)(1)(A)(ii).

Mr. Franklin moved to dismiss the firearm count against him. He argued that neither the conspiracy charge nor the substantive robbery charge, either on its own or under an aiding-and-abetting theory or *Pinkerton*-liability theory,[3] was a crime of violence under § 924(c). The district court denied the motion.

Mr. Franklin and Ms. Cowser both initially intended to try their cases to a jury, while Mr. Hiler and Mr. Pitsch entered into plea agreements. Shortly after the district court accepted those guilty pleas, Mr. Franklin also entered into a plea agreement, admitting guilt to the substantive robbery count and the firearm-possession count.

But during his change-of-plea hearing, when asked to admit to the factual basis the government had proposed, Mr. Franklin balked. He instead maintained, under oath, that he had only wanted to talk to the victims to get his money back from them. Mr. Franklin asserted that he had first sent Ms. Cowser into the house to try to talk with the victims. Then, after telling Mr. Hiler and Mr. Pitsch to stay in the car, Mr. Franklin went to the house himself. Mr. Franklin claimed that he did not know that the other two codefendants had been armed and that they had disobeyed him by running into the house about a minute later, waving their guns. Mr. Franklin also claimed not to have known that anyone had stolen anything until after the four had all returned to Mr. Franklin's Jeep. In light of these contentions, the court

---

[3] *See generally Pinkerton v. United States*, 328 U.S. 640 (1946).

rejected the plea agreement, and Mr. Franklin pleaded not guilty.

In November 2019, shortly after the abortive plea hearing, Mr. Hiler met with FBI Special Agent Jason Bowen for an in-person interview. At that interview, he told Special Agent Bowen that Mr. Franklin had sent him a note (which the jail staff would provide to Special Agent Bowen). The note said, in part:

> Now that I know you have plead [sic] out I want to respectfully request your help. . . . All I need from you is to state the truth[.]
>
> 1.  I never asked you guys to rob anyone
>
> 2.  I didn't know there were guns on anyone
>
> 3.  I said to stay in the car so I could talk to homeboy
>
> 4.  Curly had his own peice [sic] and I had nothing to do with it. He got it before the alleged incident.

The note's author was also aware that "Curly" (a nickname for Mr. Pitsch, according to Mr. Hiler) had been "squawking"—talking to the government about the robbery in this case.

Mr. Hiler later told Special Agent Bowen that he had been assaulted by two other inmates after telling the government about the note. The attackers told Mr. Hiler that Mr. Franklin had told them to "slap [him] around." Mr. Hiler sustained "[v]ery minor injuries" to the inside of his mouth as a result.

Mr. Hiler also said that he had written a response note to Mr. Franklin. In that response, which he had written "to get [Mr. Franklin] off of his back," Mr. Hiler wrote that the government had been threatening to rescind his plea agreement. At some point, Mr. Hiler gave a copy of his response note to Special Agent Bowen. The record is not clear as to when or even whether Mr. Hiler sent the response note to Mr. Franklin, when Mr. Hiler gave Special Agent Bowen a copy of the response note, or whether the copy that Special Agent Bowen received was the original or a duplicate.

During an in-person interview, Mr. Pitsch told Special Agent Bowen that Mr. Franklin had also contacted him. Mr. Franklin had warned him that "he would be on paper, and that he should be careful." Interpreting Mr. Franklin's statement as a threat that he would be branded as a snitch, Mr. Pitsch asked for a transfer to a different detention facility.

Based on these reports from Mr. Hiler and Mr. Pitsch, the government obtained a superseding indictment charging Mr. Franklin with two counts of witness tampering, in violation of 18 U.S.C. § 1512(b)(1). Mr. Franklin signed a second plea agreement, accepting guilt for the substantive robbery count and the firearm count in exchange for dismissal of the Hobbs Act conspiracy and the witness-tampering counts. In that agreement, he reserved his right to appeal the district court's denial of his motion to dismiss the firearm count; otherwise, he waived all other appellate rights except for a collateral attack based on ineffective assistance of counsel.

At a second change-of-plea hearing, contrary to his statements at the first hearing, Mr. Franklin admitted that he had intended to "relieve" the victims of their money, drugs,

or property when he went to their house and that he knew that both Mr. Hiler and Mr. Pitsch had guns. The district court accepted his guilty plea.[4]

At Mr. Franklin's sentencing hearing, the government presented hearsay statements by Mr. Hiler and Mr. Pitsch, given secondhand through Special Agent Bowen's testimony, about Mr. Franklin's attempts to influence those two men's testimony. The district court relied on those statements to find that an obstruction-of-justice enhancement applied, overruling Mr. Franklin's objection to the presentence report (PSR).

The court computed Mr. Franklin's offense level for the robbery count to be twenty-two, yielding an advisory Guidelines range of forty-six to fifty-seven months of imprisonment for that count (as his criminal history category was II). The firearms count carried a mandatory seven-year (eighty-four-month) consecutive sentence. The court then sentenced Mr. Franklin to fifty-five months of imprisonment on the robbery count; combined with the mandatory consecutive sentence, his total prison sentence was 139 months. Upon the government's motion, the district court dismissed the remaining counts against Mr. Franklin.

Mr. Franklin's timely appeal followed.

## II. Hobbs Act Robbery as a Crime of Violence

Mr. Franklin contends that Hobbs Act robbery, as defined in 18 U.S.C. § 1951(b)(1), is not categorically a

---

[4] Ms. Cowser tried her case before a jury, which convicted her of conspiracy and the substantive Hobbs Act robbery count but acquitted her of the firearm count. The court sentenced her to twelve months and one day of imprisonment followed by three years of supervised release.

crime of violence and, therefore, that the district court erred in denying his motion to dismiss. Our binding precedent says otherwise.

Possession of a firearm "in furtherance of" a "crime of violence" carries additional penalties beyond the sentence imposed for the underlying crime. 18 U.S.C. § 924(c)(1)(A). In this case, because the firearm was brandished, the additional penalty is "a term of imprisonment of not less than 7 years." *Id.* § 924(c)(1)(A)(ii). The statute defines "crime of violence" to mean a felony that either "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," *id.* § 924(c)(3)(A) (the so-called elements clause), or "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," *id.* § 924(c)(3)(B) (the so-called residual clause).

We have held that robbery under § 1951(b)(1) is "indisputably" a crime of violence because it contained an "element of 'actual or threatened force, or violence.'" *United States v. Mendez*, 992 F.2d 1488, 1491 (9th Cir. 1993) (quoting 18 U.S.C. § 1951(b)(1)). We reasoned that conspiracy to commit Hobbs Act robbery was also a crime of violence under the residual clause. *Ibid.* After the Supreme Court struck down the residual clause in *United States v. Davis*, 139 S. Ct. 2319, 2324 (2019), we took up again the question of whether conspiracy to commit Hobbs Act robbery was a crime of violence. *United States v. Dominguez*, 954 F.3d 1251 (9th Cir. 2020). After reexamining whether the substantive crime of Hobbs Act robbery is a crime of violence, we reaffirmed *Mendez*'s holding. *Id.* at 1260–61. We also held that attempted Hobbs Act robbery was a crime of violence under the elements

clause, leaving for another day whether conspiracy to commit Hobbs Act robbery likewise satisfied the elements clause. *Id.* at 1261–62.

Mr. Franklin concedes that *Mendez* and *Dominguez* are binding on us; he says he presents the issue solely to preserve it for potential review on certiorari. Thus, we hold that the district court did not err.

### III.  Due-Process Violation Through Hearsay Evidence at Sentencing

Mr. Franklin contends that the district court violated his due-process rights at sentencing by relying on his codefendants' unsworn hearsay statements, which accused him of trying to influence their testimony, in imposing the obstruction-of-justice enhancement. Finding the appropriate standard of review unclear from our precedents, we take this opportunity to clarify it. Under the correct standard, Mr. Franklin's challenge fails.

### A.  Appeal Waiver

Mr. Franklin begins by arguing that his appeal waiver does not bar our review of this issue. But the government does not address waiver at all, instead arguing the merits of his claim. We likewise proceed to the merits, the government having forfeited any claim of waiver it might have had. *United States v. Garcia-Lopez*, 309 F.3d 1121, 1123 (9th Cir. 2002); *United States v. Lewis*, 798 F.2d 1250 (9th Cir. 1986).

### B.  Legal Background

Hearsay is generally admissible in sentencing hearings, as neither the Confrontation Clause nor the Federal Rules of Evidence apply to such hearings. *United States v. Petty*,

982 F.2d 1365, 1367–69 (9th Cir.), *as amended by* 992 F.2d 1015 (9th Cir. 1993); Fed. R. Evid. 1101(d)(3). Nevertheless, "[d]ue process requires that some minimal indicia of reliability accompany a hearsay statement" introduced at sentencing. *Petty*, 982 F.2d at 1369. In particular, "relying on accomplice hearsay without adequate indicia of reliability violate[s]" due process. *United States v. Corral*, 172 F.3d 714, 716 (9th Cir. 1999). The defendant typically has the burden to show that disputed hearsay is false or unreliable. *United States v. Kimball*, 975 F.2d 563, 567 (9th Cir. 1992).[5]

But a statement by a coconspirator that inculpates the defendant "is inherently unreliable." *United States v. Huckins*, 53 F.3d 276, 279 (9th Cir. 1995) (quoting *Lee v. Illinois*, 476 U.S. 530, 546 (1986)); *see also United States v. Vera*, 893 F.3d 689, 693–94 (9th Cir. 2018) (discussing "widespread" reluctance among the courts of appeals to rely on admissions of coconspirators). We presume such statements unreliable because the coconspirator "may very well have been hoping to curry favor with law enforcement officials by implicating his accomplice." *Huckins*, 53 F.3d at 279; *see also Petty*, 982 F.2d at 1369–70 (approving of applying a rebuttable presumption of unreliability to a coconspirator's proffer to the government). Although the "fact that a statement is self-inculpatory does make it more reliable," any increased reliability is limited to the self-inculpatory aspects of the statement, not "collateral" statements about others' guilt. *Huckins*, 53 F.3d at 279

---

[5] The defendant must also show that the statements "demonstrably made the basis for the sentence," *United States v. Vanderwerfhorst*, 576 F.3d 929, 935–36 (9th Cir. 2009) (quoting *United States v. Ibarra*, 737 F.2d 825, 827 (9th Cir. 1984)). The government concedes that showing in this case.

(quoting *Williamson v. United States*, 512 U.S. 594, 600 (1994)).

Whether the government rebuts that presumption turns on whether the coconspirator's statements have independent corroboration. *See United States v. Berry*, 258 F.3d 971, 976 (9th Cir. 2001) ("One factor evidencing the reliability of hearsay statements by co-defendants is external consistency."). That corroboration may come from trial testimony, *United States v. Egge*, 223 F.3d 1128, 1132–35 (9th Cir. 2000), the defendant's own testimony, *United States v. Littlesun*, 444 F.3d 1196, 1198–99, 1201 (9th Cir. 2006), or even from other codefendants' hearsay accounts, *Berry*, 258 F.3d at 976–77.

## C. Standard of Review

Reviewing our cases, we find that we have not yet clearly enunciated the standard by which we review a district court's determination of whether coconspirator hearsay is unreliable. The government cites *United States v. Ayers*, 924 F.2d 1468, 1481 (9th Cir. 1991), for the proposition that we review for abuse of discretion. Indeed, we have said "[c]onsideration of evidence outside the record of conviction for sentencing purposes is reviewed for an abuse of discretion," and "[r]eliance on materially false or unreliable information is an abuse of discretion." *Ibid.*

We have also said, in a general way, that "[a] district court abuses its discretion when it makes an error of law, when it rests its decision on clearly erroneous findings of fact, or when we are left with 'a definite and firm conviction that the district court committed a clear error of judgment.'" *United States v. 4.85 Acres of Land, More or Less*, 546 F.3d 613, 617 (9th Cir. 2008) (quoting *United States v. Hinkson*, 526 F.3d 1262, 1277 (9th Cir. 2008), *vacated*, 547 F.3d 993

(9th Cir. 2008) (en banc) (mem.)). We have explicated that definition further, in the context of granting a new trial, in our en banc opinion in *Hinkson*:

> [I]f the district court's application of fact to law "requires an inquiry that is essentially factual," we review it as if it were a factual finding; if the district court's application of fact to law requires reference to "the values that animate legal principles," we review it as if it were a legal finding.

*United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (en banc) (quoting *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir. 1984) (en banc), *abrogated in part by Pierce v. Underwood*, 487 U.S. 552, 557–63 (1988)). That is to say, we review an essentially factual finding for clear error and an essentially legal finding de novo. *Id.* at 1259–60.

An essentially factual finding is one "requir[ing] an inquiry . . . that is founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct.'" *Id.* at 1259 (quoting *McConney*, 728 F.2d at 1202). Examples in *Hinkson* of essentially factual findings include determinations of "motive, intent, and negligence." *Id.* at 1260.

By way of contrast, "questions such as whether defendants' conduct constituted a conspiracy in violation of the Sherman Act," "questions that implicate constitutional rights," and "the meaning of due diligence or the conceptual basis for granting new trials" are questions that "require[] us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles." *Id.* at 1259–60 (quoting *McConney*, 728 F.2d

at 1202). These are essentially legal questions on which the district court receives no deference. *Id.* at 1260.

To decide whether we have a factual or legal question before us in Mr. Franklin's case, we consider the history and application of the minimal-indicia-of-reliability doctrine in our case law.

### 1. Origin and Early Development

The origin of the rule that evidence against a defendant in a sentencing hearing must bear sufficient indicia of reliability is *Townsend v. Burke*, 334 U.S. 736 (1948). There, a pro se criminal defendant had been "sentenced on the basis of assumptions concerning his criminal record which were materially untrue." *Id.* at 741. One of the charges relied upon by the sentencing court had been dismissed, and the defendant had been acquitted of two others. *Id.* at 740. Although the sentence had been "within the limits set by statute" and "its severity would not be grounds for relief," it was "the careless or designed pronouncement of sentence on a foundation so extensively and materially false, which the prisoner had no opportunity to correct by the services which counsel would provide, that render[ed] the proceedings lacking in due process." *Id.* at 741.

We applied and extended *Townsend* in *United States v. Weston*, 448 F.2d 626 (9th Cir. 1971), holding that the district court's reliance on not just materially false but also unreliable information violated due process. (See *infra* pp. 22–24 for more discussion of *Weston*.)

In *United States v. Ibarra*, 737 F.2d 825 (9th Cir. 1984), we attempted to clarify the meaning of "false or unreliable" by defining it to mean lacking in "some minimal indicium of reliability beyond mere allegation." *Id.* at 827 (quoting

*United States v. Baylin*, 696 F.2d 1030, 1040 (3d Cir. 1982) (construing *Weston*, 448 F.2d at 633–34)).

*Ibarra* also stated that "[w]e review a sentence for abuse of discretion if [the] defendant can show that the district court relied on information that should not have been considered during the sentencing phase." 737 F.2d at 826–27 (citations omitted). That statement expressed the prevailing standard of review before the introduction of the Sentencing Guidelines, which came about shortly after we decided *Ibarra*. *See, e.g.*, *United States v. Wilson*, 900 F.2d 1350, 1354 (9th Cir. 1990) ("Prior to the Guidelines' promulgation, . . . district courts employed a gestalt approach to sentencing where a single factual determination rarely had a sufficiently significant impact on the overall sentence to warrant an appeal."); *United States v. Sanchez-Murillo*, 608 F.2d 1314, 1319 (9th Cir. 1979) (noting that the "only exception to this rule is where the defendant can establish that information presented to the court prior to sentencing should not have been considered," which would supply the basis for a claim of an abuse of discretion); *United States v. Kearney*, 560 F.2d 1358, 1369 (9th Cir. 1977) ("A federal trial judge has wide discretion in imposing sentence, and where . . . the sentence pronounced is within statutorily-prescribed limits, it is generally not subject to review.").

### 2.  Effect of the Sentencing Guidelines and *Booker*

With the advent of the Guidelines, which were binding until *United States v. Booker*, 543 U.S. 220 (2005), made them advisory, district courts no longer exercised traditional sentencing discretion, adjusting the weights of sentencing factors "to reflect the differences in the relative certainty of information on which the sentences [we]re based." *Wilson*, 900 F.2d at 1352 (quoting *United States v. Davis*, 715 F. Supp. 1473, 1477 (C.D. Cal. 1989), *aff'd in part and vacated*

*in part*, 960 F.2d 820 (9th Cir. 1992)). Instead, they had to "'[d]etermine the base offense level and apply any *appropriate* specific offense characteristics' and 'adjustments *as appropriate* related to victim, role, and obstruction of justice.'" *Ibid.* (alteration in original) (quoting U.S.S.G. § 1B1.1(b)–(c), (e)–(f)). We interpreted "appropriate" to include the due-process requirement that the court "apply only those factors for which sufficiently reliable information exists." *Ibid.* But we held that "[d]etermining that information is not materially false does not require any type of heightened scrutiny. It is enough that the sentencing judge is convinced that the disputed fact, as alleged, is true." *Id.* at 1353 (quoting *United States v. McDowell*, 888 F.2d 285, 291 (3d Cir. 1989)). And proof by a preponderance of the evidence was sufficient, we held:

> [A] defendant's due process right to ensure the reliability of information used at sentencing includes the requirement that facts underlying sentencing factors be proved according to a specified standard of proof. . . .

> We hold . . . that district courts are constitutionally required to make factual determinations underlying application of the Guidelines by at least a preponderance of the evidence. As so interpreted, the Guidelines do not violate due process.

*Id.* at 1354. That was perhaps our clearest statement tying reliability of sentencing evidence to the sentencing court's factfinding function.

But we still did not describe our review of reliability determinations as clear-error review. Rather, in *FTC v. American National Cellular*, 868 F.2d 315, 322 (9th Cir. 1989), we looked to a pre-Guidelines case, *United States v. Larios*, 640 F.2d 938, 942 (9th Cir. 1981), in which we had stated the prevailing view that "[j]udges are given very broad discretion to consider information from a wide variety of sources when sentencing because it is important for the sentencing judge to be able to fashion sentences properly . . . [for] individual defendants." Without any analysis, we repeated that "[a] district court's consideration of information outside the record of conviction for sentencing purposes is reviewed for an abuse of discretion." *Am. Nat'l Cellular*, 868 F.2d at 322. We then said that "[w]e will find an abuse of discretion if the defendant shows that the district court relied on materially false or unreliable information," *ibid.* (citing *United States v. Messer*, 785 F.2d 832, 834 (9th Cir. 1986)), but we gave no separate instructions for how to determine if a defendant made such a showing (and neither did *Messer*). We have since repeated this "abuse of discretion" language but never explicitly defined what it means in this context. *See, e.g.*, *Ayers*, 924 F.2d at 1481 (citing *Am. Nat'l Cellular*, 868 F.2d at 322); *Petty*, 982 F.2d at 1369 (citing *Ayers*, 924 F.2d at 1481); *United States v. Hanna*, 49 F.3d 572, 577 (9th Cir. 1995) (citing *Petty*, 982 F.2d at 1369).

After *Booker* made the Guidelines advisory rather than binding, much of district courts' traditional sentencing discretion was restored. But *Booker* did not much affect our review of reliability determinations. District courts still must correctly compute the Guidelines range as a part of the sentencing process. *United States v. Carty*, 520 F.3d 984, 991–93 (9th Cir. 2008) (en banc). For that computation, the government must still prove by at least a preponderance any

facts underlying a base offense level or sentence enhancement. *United States v. Pike*, 473 F.3d 1053, 1057 (9th Cir. 2007).

We now review all sentences for an abuse of discretion, whether they are inside or outside the correctly computed Guidelines range. *Carty*, 520 F.3d at 993. That means "ensur[ing] that the district court committed no significant procedural error, such as . . . selecting a sentence based on clearly erroneous facts," *Gall v. United States*, 552 U.S. 38, 51 (2007), and then considering the substantive reasonableness of a procedurally sound sentence, duly deferring to a district court's finding that the 18 U.S.C. § 3553(a) factors justify any variance from the Guidelines range, *Carty*, 520 F.3d at 993. In short, the case law we built before *Booker* surrounding Guidelines determinations is still good law, now interwoven with additional structure for incorporating *Booker*'s remedial component.

### 3.  Historical Application of the Minimal-Indicia-of-Reliability Doctrine

A survey of our application of the minimal-indicia-of-reliability doctrine over time demonstrates two overarching concerns that sometimes come into tension. The sentencing court should have as much information as possible so that it can effectively discharge its duty—to sentence each person as an individual. But there must also be sufficient procedural protections to allow a defendant the opportunity to question and refute evidence against him at sentencing. Our survey also reveals two separate inquiries that we have developed to accommodate these two concerns. The first was primarily an examination of the process afforded a defendant during sentencing. Later, we relaxed the bar on hearsay evidence at sentencing to allow statements that appeared substantively reliable, even if the defendant did not receive the same

procedural protections in challenging them that we had formerly required.

### a. At First, We Were Concerned Primarily with Procedure

i. *United States v. Weston*, 448 F.2d 626 (9th Cir. 1971). In one of our first cases discussing due-process rights at sentencing, the defendant, convicted of trafficking heroin, had been sentenced to the statutory maximum of twenty years of imprisonment. *Id.* at 630. The district court based its sentence on assertions by federal narcotics agents in the PSR that she had been "the chief supplier [of heroin] to the Western Washington area." *Id.* at 628. The district court, opining that the probation officers who had compiled the report were "extremely objective," and noting that the defendant had not provided any "contrary factual information, rather than simply a vehement denial," accepted the PSR as true. *Id.* at 629. It advised the defendant that she could bring a motion later if she obtained any information to refute the report, to which her counsel responded, "I can't conceive of what type of investigation I can do to come back and say that she isn't" the "biggest dealer in the Western states." *Ibid.* Nevertheless, the district court imposed the maximum sentence.

We vacated that sentence on appeal. Upon reviewing the sealed record, we observed that the PSR's allegations came from a narcotics agent's "unsworn memorandum" that merely "quote[d] a named informant, described only as 'previously identified as a reliable cooperating individual,' who indicate[d]" only that the defendant was *about to* make—not that she *had made*—a trip to Mexico to obtain heroin. *Id.* at 630. We found that the report "contain[ed] nothing to show, rather than to assert, that the information was reliable, or otherwise to verify the very serious charge

made against Weston." *Ibid.* That was "tantamount," we said,

> to saying that once a defendant has been convicted of offense A, narcotics agents can say to the probation officer, and the probation officer can say to the judge, "We think that she is guilty of much more serious offense B, although all we have to go on is an informer's report," and the judge can then say to the defendant, "You say it isn't so; prove that to me!" In addition to the difficulty of "proving a negative," we think it a great miscarriage of justice to expect Weston or her attorney to assume the burden and expense of proving to the court that she is not the large scale dealer that the anonymous informant says that she is.

*Id.* at 634. Thus, we held, "a sentence cannot be predicated on information of so little value as that here involved. A rational penal system must have some concern for the probable accuracy of the informational inputs in the sentencing process." *Ibid.* We remanded for a new sentencing hearing, directing the district court not to consider the information from the PSR "unless it is amplified by information such as to be persuasive of the validity of the charge there made." *Ibid.*

*Weston* stands for the proposition that if the sentencing process effectively puts the burden of proof on the defendant to refute a damaging hearsay allegation, particularly when the factual basis for believing such a charge is practically nonexistent, that process is legally flawed. *See id.* at 633. The district court treated as controlling the inherent credibility of

the probation officers preparing the PSR and the agents interviewed for the report's factual bases, regardless of the credibility of those officers' and agents' sources. The government could effectively assert anything in the PSR and require the defendant to refute it. Such a system is repugnant to due process. *See id.* at 634.

ii. *United States v. Petty*, 982 F.2d 1365 (9th Cir. 1993). This was a post-Guidelines case in which the kingpin of a cocaine-trafficking scheme, Mr. Kessack, gave a statement during plea negotiations with the government. *Id.* at 1366. Negotiations broke down, and Mr. Kessack and his coconspirators were convicted at trial. *Id.* at 1367. After Mr. Kessack was sentenced, he refused to testify at the other defendants' sentencing hearing, despite an order compelling his testimony. *Ibid.* So the district court, upon the government's motion, unsealed and reviewed Mr. Kessack's statement. *Ibid.* Mr. Kessack then made a second, sworn statement that "cast doubt on the accuracy and reliability of his first [s]tatement." *Ibid.* But the district court, after determining that his first statement "was corroborated by other evidence," found that the conspiracy "involved more than 50 kilograms of cocaine" based on information in the first statement. It sentenced the other defendants based on that amount. *Ibid.*

We affirmed, approving the district court's procedure of treating the hearsay statement as "presumptively unreliable" and finding that presumption rebutted upon consideration of other, corroborating evidence. *Id.* at 1369. Indeed, we expressly endorsed the use of "extrinsic corroborating evidence to establish the reliability of hearsay . . . at sentencing," including in-court witness testimony and admissions by members of the conspiracy. *Ibid.*

Notably, the external corroborating evidence considered by the district court in *Petty* was evidence that the defendants could have attempted to impeach via cross-examination in the normal course of the hearing. Had that evidence been false, the defendants had the usual tools of criminal procedure to challenge and refute it. And, had the defendants successfully refuted such evidence, there would have been no external corroboration supporting the hearsay statement, and it would have been inadmissible. Thus, the district court's procedure did not offend due process because, unlike in *Weston*, the burden was not on the defendants to disprove the government's allegations, and the government had proffered sufficient evidence tending to corroborate the coconspirator's hearsay statement.

iii. *United States v. Huckins*, 53 F.3d 276 (9th Cir. 1995). In *Huckins*, we found insufficient indicia of reliability to support hearsay statements by the defendant's accomplice that the defendant had been armed with a gun during two bank robberies. *Id.* at 278–79. The accomplice's statements "were not made under oath, nor at trial where he could be cross-examined" but rather "in the context of plea negotiations with the government, in which [he] may very well have been hoping to curry favor with law enforcement officials." *Id.* at 279. Moreover, the part of the accomplice's statements attesting that the defendant had been armed was collateral to the part inculpating the accomplice. *Ibid.* We therefore removed those statements from consideration, leaving a single bank teller's statement that the defendant put his hands in his pocket during a third robbery, which we found was not enough to "prove by a preponderance of the evidence that Huckins was armed" at any of the robberies. *Ibid.*

As in *Weston*, in *Huckins* we were concerned with the procedural problem inherent in relying on the accomplice's statements—unsworn, impossible for the defendant to cross-examine. We did have a substantive concern that the accomplice's statement was likely *not* reliable. But despite this substantive dimension, our reliability review in *Huckins* was still essentially procedural. It was not for clear error—indeed, a reasonable factfinder could have credited the accomplice's statements, especially combined with the bank teller's observation. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). And we made a separate finding of factual error: Considering the only piece of sufficiently reliable evidence supporting the proposition that Mr. Huckins had been armed at any of the robberies (that is, the bank teller's statement), we found that evidence unable to support that proposition by a preponderance of the evidence. *Huckins*, 53 F.3d at 279. So *Huckins* suggests that we did not treat the reliability determination as an issue of fact but rather as an essentially legal, procedural issue.

It is also noteworthy that we rejected the government's argument on appeal that the bank teller's statement about one robbery was partially corroborative of the coconspirator's statement about the other two robberies. *See* Brief for the United States at 19, *Huckins*, 53 F.3d 276 (No. 94-30052), 1994 WL 16059689, at *19. Instead, we agreed with the government's statement in the district court that the bank teller's "perception that Mr. Huckins had a gun did not constitute evidence that he in fact had one." Defendant-Appellant's Opening Brief at 9, *Huckins*, 53 F.3d 276 (No. 94-30052), 1994 WL 16059688, at *9; *Huckins*, 53 F.3d at 279. That foreshadowed the way in which our substantive

review of the reliability of a hearsay statement would come to the forefront of the doctrine.

iv. *United States v. Garcia-Sanchez*, 189 F.3d 1143 (9th Cir. 1999). Although we noted in *Garcia-Sanchez* that "[w]e show great deference to trial court factual determinations, reviewing [them] only for clear error," *id.* at 1148, we nevertheless vacated the district court's sentence on the grounds that the evidence did not have sufficient indicia of reliability. Indeed, *Garcia-Sanchez* reads much like a replay of *Weston*. We held that the district court erred by relying solely on "conclusory testimony" from a case agent at the sentencing hearing, who stated:

> [a]s a result of interviewing Lawrence Bertolino, who is the principal middle person here in Spokane for Cipriano, [i.e.] Zavala[,] and Rutilio Garcia[-Sanchez]'s distribution of cocaine and heroin, we determined that cocaine was being sold anywhere from two to three ounces a week from the Bertolino residence. In addition to one to two ounces of heroin.

*Id.* at 1149 (alterations in original). In particular, the agent "had no first-hand knowledge of the conspiracy's sales," "did not explain how he arrived at his estimates," "did not reveal the hearsay upon which he relied," "did not produce the contemporaneous . . . reports of his interviews," "was not cross-examined," and "was not tested or challenged" on his opinion. *Ibid.*

The procedural defect in *Garcia-Sanchez* was the same as in *Weston*. Although the case agent had identified the source interviewed for the report, the report was nevertheless conclusory, not breaking down the steps of the agent's

analysis to show how he arrived at his conclusions. The defendant could do little but deny what Mr. Bertolino had purportedly said. Putting the burden of proof on the defendant violated his due-process rights, just as in *Weston*, and we reached the same conclusion (albeit without citing *Weston*).

Thus, up to the turn of the millennium, our cases on the minimal-indicia-of-reliability doctrine generally treated it as a procedural issue, even if we also implicitly considered the substantive reliability of the hearsay statements at issue. The main concern was whether the district court unfairly put the burden on the defendant to produce evidence to disprove government allegations. Although in some cases we allowed corroboration by external evidence, the defendants in such cases had an opportunity to challenge that external evidence through cross-examination. The "indicia of reliability" flowed from the procedural mechanisms allowing the defendant to challenge government allegations.

### b.  Later, We Began Considering Substantive Indicia of Reliability

Starting in the late 1990s, we expanded our understanding of "minimal indicia of reliability" to include whether the hearsay statement itself was likely substantively reliable. If so, its admission at sentencing satisfied due process, even if the defendant did not have the opportunity to challenge the source or other evidence corroborating the source in open court.

i. *United States v. Chee*, 110 F.3d 1489 (9th Cir. 1997). *Chee* gives an early example of our substantive-reliability review. There, the defendant pleaded guilty to assaulting his girlfriend on an Indian reservation. *Id.* at 1491–92. An FBI agent interviewed the girlfriend at a hospital, where she said

that the defendant had "forced her to get into [a] car by throwing her into the car, closing the door behind her, and quickly driving away while using the power door locks." *Id.* at 1491. She said that, after beating her and threatening to kill her with a gun in his car trunk, he took her to a motel room and raped her. *Ibid.* When the defendant left the room, the girlfriend "called her mother, who called the police, and the front desk." *Ibid.* A state police officer also took a statement from the girlfriend at the motel and the hospital, and he noted that she had "many bruises, abrasions, and bite marks on her head, back, arms and legs." *Id.* at 1491–92. The district court relied on those and other hearsay statements by the girlfriend in sentencing the defendant, including applying a three-level enhancement for threatening to use a deadly weapon and a two-level enhancement for restraining his victim. *Id.* at 1492.

We held that the district court permissibly relied on the statements. The district court had found that the statements were "credible and trustworthy" at least partially "because they were made 'immediately upon contact with her mother, with the contact by the police, and to hospital staff.'" *Ibid.* We also noted that the girlfriend's statements were "corroborat[ed] by other statements, including [the defendant]'s statement." *Id.* at 1493. Moreover, her statements were consistent with the state police officer's description of her injuries. Thus, in *Chee*, we began to primarily consider the intrinsic reliability of the hearsay statement itself, albeit still in combination with external corroborating evidence that the defendant could challenge at the sentencing hearing.

ii. *United States v. Berry*, 258 F.3d 971 (9th Cir. 2001). This case established that even presumptively unreliable statements can permissibly corroborate one another. The

defendant had pleaded guilty to one count of possession of stolen mail arising out of a scheme involving depositing stolen checks and using stolen credit cards. *Id.* at 974–75. In preparing the PSR, the probation officer interviewed the defendant's coconspirators, who all stated that the defendant had "solicited them to pass stolen and forged checks through their personal bank accounts" and that the defendant "would retain the majority of the ill-gotten proceeds despite the co-defendants' frequent assumption of the greatest risks in perpetrating the crimes." *Id.* at 977. The defendant denied those allegations, instead stating that the coconspirators had "all solicited *him* to run stolen checks through their accounts" and that "the person who deposited the stolen checks into their account received between seventy and eighty percent of the recovered funds." *Id.* at 975. The district court rejected Mr. Berry's version and relied on the coconspirators' statements to impose a four-level leadership-role enhancement. *Ibid.*

We affirmed. Although the district court had not made express findings about the reliability of the coconspirators' statements, we held that reversal was not warranted because the "reliability of the hearsay statements [wa]s apparent from the record." *Id.* at 976. Citing cases from the First and Eleventh Circuits, we adopted the rule that "hearsay statements by co-defendants that are consistent with each other may be deemed sufficiently reliable even if such statements are self-serving and contrary to the testimony of the defendant." *Id.* at 976–77. And three coconspirators' statements that the defendant had directed the enterprise in the same manner with respect to each defendant was enough consistency to satisfy us that the statements had "some minimal indicia of reliability." *Ibid.* (quoting *Petty*, 982 F.2d at 1369).

Thus, for the first time in *Berry*, we held that hearsay allegations denied by the defendant—and uncorroborated by external evidence that a defendant could challenge using the normal tools of criminal procedure—could support facts underlying sentencing enhancements. The doctrine no longer provided a purely procedural protection for the defendant. So long as the district court did not use substantively unreliable information to sentence the defendant, the defendant had received due process. That aligns with the goal of maximizing the amount of information available to the district court to "ensure[] that the punishment will suit not merely the offense but the individual defendant." *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)); *see also* 18 U.S.C. § 3661; U.S.S.G. § 1B1.4.

c.  Balancing Procedural and Substantive Protections

Following *Berry*, our cases continued to show some concern with affording the defendant procedural protections against coconspirator hearsay, generally in cases with no substantive indicia of reliability.

i. *United States v. McGowan*, 668 F.3d 601 (9th Cir. 2012). In *McGowan*, we vacated the sentence of a prison guard convicted of assaulting inmates. One inmate had testified in a different case that he had given the defendant drugs to smuggle into prison, and the district court admitted that testimony during sentencing in transcript form. *Id.* at 607. That same inmate had also given similar statements to FBI agents. *Ibid.* The government tried to corroborate the inmate's statements by noting that the inmate had known where the defendant's house was located. *Ibid.* Disagreeing with the district court, we held such knowledge to be insufficient corroboration, noting that the defendant had

explained why the inmate would have known that fact: The inmate had been a squatter in that house before the defendant had bought it. *Id.* at 607–08 & n.3. We also observed that there was no other evidence to corroborate the allegations. *Id.* at 608.

In rejecting the inmate's hearsay, we emphasized the procedural defects. Even though the inmate had testified— "fleetingly"—under oath in a different case, the sentencing judge had only the bare transcript and therefore no opportunity to perceive the inmate's demeanor during that testimony. *Id.* at 607. Moreover, the defendant had no opportunity to cross-examine the inmate's testimony because it was in a different case, and neither did the defendant (nor the government) in that case have any incentive to cross-examine the inmate. *Id.* at 607–08. Thus, we held, the "allegations were made under oath but absent any other *procedural mechanism* that would ensure that a witness with the incentive to lie was telling the truth." *Id.* at 608 (emphasis added).

ii. *United States v. Pimentel-Lopez*, 859 F.3d 1134 (9th Cir. 2016). In *Pimentel-Lopez*, we applied the rule from *Berry* in considering the statements of a codefendant, Mr. Elizondo, as related through a government agent at sentencing. The agent testified that Mr. Elizondo had said that Mr. Pimentel-Lopez had directed Mr. Elizondo's fiancée and her sister "to rent a house 'to be used . . . to distribute drugs'" and that he had "directed two individuals to deposit the proceeds of the drug sales into a bank account." *Id.* at 1144. The fiancée had corroborated those allegations in a police interview before trial. *Ibid.* But, at trial, neither the fiancée nor her sister testified that Mr. Pimentel-Lopez had directed them to rent any house or directed anyone to deposit drug proceeds. *Ibid.* In fact, the

sister testified "that she couldn't even communicate with Pimentel-Lopez because she didn't speak Spanish." *Ibid.* Even so, the district court relied on those pretrial statements to enhance Mr. Pimentel-Lopez's sentence because he directed his coconspirators' behavior. *Id.* at 1143.

Because Mr. Elizondo's "statements were not made under oath, nor at trial where he could be cross-examined," *id.* at 1144 (quoting *Huckins*, 53 F.3d at 279), we applied the presumption that "a codefendant's confession inculpating the accused is inherently unreliable," *ibid.* (quoting *Lee*, 476 U.S. at 546). And, following *Berry*, we asked whether external evidence corroborated Mr. Elizondo's hearsay statements. *Ibid.* The only external corroboration of his statements was another out-of-court statement by his fiancée. *Ibid.* Recognizing that even "self-serving" statements can constitute minimal indicia of reliability, *ibid.* (quoting *Berry*, 258 F.3d at 976–77), we nevertheless had sufficient "doubt" of Mr. Elizondo's purported statements to deem them uncorroborated, *ibid.* For one thing, even though the fiancée had corroborated those hearsay statements before trial, she did not testify to them *at* trial. *Ibid.* For another, the sister's testimony that she could not speak Spanish made the proposition that Mr. Pimentel-Lopez had "directed" her to do something unlikely. *Ibid.*

Our inquiry in *Pimentel-Lopez* was essentially factual. Although we noted that the statement at issue and the corroborating statement were both out-of-court hearsay, the defendant's inability to challenge them did not drive our decision. Nor could it have after *Berry*. Instead, contrary to the district court, we assigned greater weight to the statements given under oath in open court, even considering silence on some issue in court to be enough to discount an earlier hearsay statement. And we considered the logical

import of the hearsay statements and the testimony given at trial, inferring from the sister's testimony that the hearsay statements were less likely to be true. Weighing the evidence and determining relative credibility are not legal questions—they involve "the application of the fact-finding tribunal's experience with the mainsprings of human conduct." *Hinkson*, 585 F.3d at 1259 (quoting *McConney*, 728 F.2d at 1202). Although we did not say so explicitly, we conducted clear-error review in *Pimentel-Lopez*, reversing the district court's implicit finding that Mr. Elizondo's hearsay statements were reliable.[6]

iii. *United States v. Vera*, 893 F.3d 689 (9th Cir. 2018). In *Vera*, the government sought to prove the amount of drugs that the defendant brothers had sold by using the factual statements from twelve codefendants' plea agreements. *Id.* at 691, 694. Again applying *Berry*, we examined those plea agreements to determine whether they sufficiently corroborated one another. We extensively analyzed the facts alleged in the plea agreements. Although those allegations adequately established that the Veras had some part in the drug scheme, only four specific drug transactions were referenced in more than one plea agreement (out of the forty total transactions represented in the agreements). *Id.* at 694–95. The plea agreements attributed none of those four transactions specifically to either brother. *Id.* at 695. Although the drug quantities listed in one plea agreement were verified independently by DEA laboratory reports, neither the plea agreement nor the laboratory reports

---

[6] We *did* use clear-error review to find the sentencing enhancement inappropriate, but that was because, after we threw out the hearsay statements, there was "no evidence" that the defendant had directed others. 859 F.3d at 1144. We did not cite any standard of review—not even abuse of discretion—of the district court's reliability determination.

connected those transactions to the Veras. *Ibid.* We thus found that there was insufficient external corroboration for those agreements to be evidence against the brothers in their sentencing hearing. *Ibid.*

### 4. Synthesizing the Case Law

Having examined the development of the minimal-indicia-of-reliability doctrine over the last half-century, we conclude that there are two distinct questions that we answer in examining a hearsay statement at sentencing: (1) whether the statement is "procedurally reliable" and (2) whether the statement is "substantively reliable." This is a disjunctive test: If we answer either question in the affirmative, then the statement may be considered at sentencing.

First, procedural reliability. We ask whether there are sufficient procedural protections so that the defendant does not have to "prove a negative" in the face of government allegations. This is an essentially legal question because whether the defendant is in that position "implicate[s] constitutional rights" and requires us "to exercise judgment about the values that animate legal principles." *Hinkson*, 585 F.3d at 1260 (citation omitted).

Generally, if the government supports the hearsay statements with extrinsic evidence that the defendant can challenge on cross-examination, then we have found the process to be adequate to ensure that the defendant is not sentenced on the basis of unreliable or false information. *See Petty*, 982 F.2d at 1366–69. The district court may then consider the hearsay statement under the rubric of procedural

reliability after finding the extrinsic evidence to sufficiently corroborate the hearsay statement.[7] *Ibid*.

Second, if the government offers no corroboration of a hearsay statement that the defendant can challenge at sentencing through the normal adversarial process, we proceed to the substantive inquiry. As our cases show, substantive indicia of reliability can be enough to safeguard the defendant's right not to be sentenced on the basis of unreliable or false information. Thus, hearsay from a source that is self-demonstrably reliable is permissible on its own. *See Chee*, 110 F.3d at 1492. And even if the hearsay is from a presumptively unreliable source, such as a coconspirator, the government can prove its reliability by exhibiting other, independently obtained, consistent hearsay statements— even other presumptively unreliable statements, as in *Berry*. But, unlike procedural reliability, substantive reliability is an essentially factual issue. It requires judging whether a statement is probably truthful in light of all the circumstances—that is, "the application of the fact-finding tribunal's experience with the mainsprings of human conduct." *Hinkson*, 585 F.3d at 1259 (quoting *McConney*, 728 F.2d at 1202).

The upshot is this. A determination of procedural reliability—that the hearsay in question does not put the burden on the defendant to prove a negative and that the defendant has adequate opportunity to confront corroborative evidence of the hearsay—is an essentially legal question that we review de novo. A determination of

---

[7] The defendant may, of course, challenge such a finding on appeal, and we would review that finding for clear error. *See United States v. Hernandez*, 105 F.3d 1330, 1332 (9th Cir. 1997); *United States v. Miller*, 874 F.2d 1255, 1279–80 (9th Cir. 1989).

substantive reliability—whether hearsay statements admitted at sentencing are from reliable sources or are consistent enough with one another to indicate their probable truth—is an essentially factual question that we review for clear error. And so long as each hearsay statement offered by the government at sentencing is either procedurally reliable or substantively reliable, due process is not offended.

## D. Application

Here, the government gives two reasons that the use of Mr. Hiler's and Mr. Pitsch's statements[8] at Mr. Franklin's sentencing did not violate his due-process rights. One invokes procedural reliability; the other invokes substantive reliability.

### 1. Procedural Reliability

We first consider the government's argument that external, nonhearsay evidence corroborates Mr. Hiler's hearsay statements. The statements at issue here are (1) that

---

[8] As a reminder: After Mr. Franklin's first, failed change-of-plea hearing, Mr. Hiler told FBI Special Agent Bowen that he had received a note from Mr. Franklin. That note asked Mr. Hiler to testify at trial consistently with Mr. Franklin's statements at the plea hearing. After disclosing the note to the government, Mr. Hiler claimed to have been assaulted by other inmates at Mr. Franklin's behest, sustaining "[v]ery minor injuries" in his mouth. Special Agent Bowen later received a second note, written by Mr. Hiler as a response to Mr. Franklin "to get [Mr. Franklin] off of his back."

Separately, Mr. Pitsch told Special Agent Bowen that Mr. Franklin had warned him that he was going to be branded as a snitch and advised him to be cautious. Taking the warning as a threat, Mr. Pitsch asked for a transfer to a different detention facility.

Mr. Franklin sent Mr. Hiler a note asking him to give false testimony and (2) that Mr. Franklin sent inmates to rough up Mr. Hiler after he disclosed the note to the government. We analyze de novo whether Mr. Franklin was required to "prove a negative"—whether he had adequate opportunity to meet external evidence at his sentencing hearing.

Mr. Franklin did not bear the burden of disproving conclusory government allegations. Unlike in *Weston* and *Garcia-Sanchez*, the government did not use a government agent as a mere mouthpiece for unsourced obstruction-of-justice allegations. Instead, Special Agent Bowen related detailed, specific statements and identified the sources of those statements—Mr. Hiler and Mr. Pitsch. The government also offered extrinsic, nonhearsay evidence to corroborate those hearsay statements: (1) Special Agent Bowen's personal observation of Mr. Hiler's mouth injuries, (2) the copy of the note (purportedly from Mr. Franklin) that Special Agent Bowen received, and (3) the transcript of Mr. Franklin's first change-of-plea hearing.[9] Combined with the rebuttable presumption of unreliability that we impose on coconspirators' inculpatory statements, the government was indeed saddled with the burden to prove the obstruction enhancement's applicability.

As for opportunities to challenge the government's external, nonhearsay evidence: First, Special Agent Bowen testified at the sentencing hearing, and Mr. Franklin cross-examined him. Cross-examination is the "gold standard" of

---

[9] Although the latter two pieces of evidence are out-of-court statements, their relevance to the obstruction-of-justice enhancement does not come from whether the statements are true, so they are not hearsay. Instead, the note and transcript together are evidence that the author of the note is likely someone familiar with the hearing.

procedural reliability. *Murdoch v. Castro*, 609 F.3d 983, 1003 (9th Cir. 2010) (en banc) (Kozinski, C.J., dissenting). So Mr. Franklin could adequately meet Special Agent Bowen's observations of Mr. Hiler's injuries.

Second: The copy of the note was present at the sentencing hearing and entered into evidence. If the note really had been forged, Mr. Franklin could have tried to challenge the note's provenance by, for example, introducing an exemplar of his own handwriting or having a handwriting analysis expert testify to show that he had not written the note. Or he could have attempted to find some detail stated in the note that he would *not* have known but someone else (presumably whoever forged it) *would* have known. And so on. In other words, Mr. Franklin had a full and fair opportunity to challenge the premise that he was the source of the note. So he could adequately meet that evidence, too.

And third: The transcript of the first plea hearing. Although Mr. Franklin could not reasonably dispute the reliability of the transcription, that is not a procedural problem—it is substantive. His remedy would have been to argue in the district court, as he does now on appeal, that the corroborative inference is weak—perhaps because Mr. Hiler had easy access to a transcript of the hearing and could have used it to forge the note. *Cf. United States v. Matta-Ballesteros*, 71 F.3d 754, 766–67 (9th Cir. 1995) (defendant's objection—that forensic expert's finding that hairs at crime scene were consistent with defendant's did not prove defendant was the only person who could have left the hairs—went to weight, not admissibility); *id.* at 768–69 (objection to defect in chain of custody went to weight, not admissibility).

Thus, there were adequate procedural opportunities for Mr. Franklin to challenge the extrinsic, nonhearsay evidence corroborating Mr. Hiler's hearsay statements. Perceiving no error in the district court's conclusion that this evidence sufficiently corroborated Mr. Hiler's statements, we conclude that the admission of those statements at sentencing did not deprive Mr. Franklin of due process.

## 2.  Substantive Reliability

We also consider the government's argument that Mr. Hiler's and Mr. Pitsch's hearsay statements corroborate *each other* enough to be admissible at sentencing. Although the district court did not make an express finding of reliability, we read the court's ruling on the obstruction-of-justice enhancement as making such a finding implicitly.[10] We review it for clear error.

And we find none. Each coconspirator reported that Mr. Franklin pressured him to testify a certain way—or not to testify—following the first change-of-plea hearing. Although the two accounts were not uniformly consistent, as was the case in *Berry*, they both flowed from the same triggering incident: Mr. Franklin's first plea hearing. They shared the common premise that Mr. Franklin had a consistent underlying motivation: that he wanted no one to testify contrary to his statements at that plea hearing, whether to avoid a perjury charge or to potentially win an acquittal at trial. And Mr. Hiler's statement that "Curly" is a

---

[10] From the record: "I have reviewed this matter in its entirety, including the [coconspirators'] statements that appear in the presentence report, the testimony that was given in supplementation at the hearing here today, and it is my conclusion that taken as a whole, that the evidence, in fact, does support the obstruction of justice recommended by the presentence officer in the presentence report."

nickname for Mr. Pitsch, combined with the note's mentioning that "Curly" had been "squawking," corroborates Mr. Pitsch's statement that Mr. Franklin had been threatening to brand Mr. Pitsch a snitch. The district court therefore did not clearly err in finding the two coconspirators' statements to corroborate each other enough to be substantively reliable. Thus, the statements' admission at sentencing did not violate due process.

## IV. Conclusion

Binding precedent forecloses Mr. Franklin's claim that Hobbs Act robbery is not a crime of violence under 18 U.S.C. § 924(c)(3)(A). And the district court did not abuse its discretion in considering the statements of Mr. Hiler and Mr. Pitsch in imposing an obstruction-of-justice enhancement at sentencing. The government provided enough specifics so that Mr. Franklin was not put to the burden of proving that the enhancement did not apply, Mr. Hiler's statements were tied to other evidence that was subject to procedural tests of reliability, and the two men's statements otherwise corroborated each other enough to be substantively reliable.

**AFFIRMED.**

BERZON, Circuit Judge, concurring in the judgment:

I agree with the majority's conclusion that the district court did not err in relying on hearsay statements from Hiler and Pitsch as the basis for an obstruction-of-justice enhancement to Franklin's sentence. I write separately because my interpretation of our case law on the minimal-indicia-of-reliability doctrine is somewhat different from the

majority's. Specifically, I disagree that we have developed a disjunctive test under which a hearsay statement may form the basis for a defendant's sentence if it is *either* "procedurally reliable" or "substantively reliable." Majority op. 37. I read our cases as requiring, at a minimum, substantive reliability.

## I

We have regularly stated that we "review for abuse of discretion the district court's evaluation of the reliability of evidence at sentencing." *United States v. Vera*, 893 F.3d 689, 692 (9th Cir. 2018); *see, e.g.*, *United States v. McGowan*, 668 F.3d 601, 606–08 (9th Cir. 2012); *United States v. Berry*, 258 F.3d 971, 976 (9th Cir. 2001); *United States v. Chee*, 110 F.3d 1489, 1492–93 (9th Cir. 1997). As the majority observes, however, we have not clearly explained how we determine whether a district court abused its discretion by basing a sentence on hearsay. Majority op. 15.

The majority carefully traces the development of our case law in this area and demonstrates that our earlier cases often focused on the procedural injury to a defendant when the district court based a sentence on unreliable hearsay, while our later cases were more likely to engage in a close factual examination of a hearsay statement to evaluate its reliability. *Id.* at 21–35. Based on this inquiry, the majority concludes that due process allows a district court to base a sentence on a hearsay statement if *either* the statement is "procedurally reliable," that is, "there are sufficient procedural protections so that the defendant does not have to 'prove a negative' in the face of government allegations," *id.* at 35, *or* the statement is "substantively reliable," meaning, for example, that the statement is "from a source that is self-demonstrably reliable" or there is independent evidence corroborating it, *id.* at 36.

The majority does not point to any case in which we approved the district court's reliance on a hearsay statement at sentencing solely because the statement was "procedurally reliable," without any indicia of substantive reliability. True, many of our cases have rightly emphasized the procedural problems inherent in relying on a hearsay statement at sentencing that a defendant never had an opportunity to test by cross-examination. But these same cases also show a parallel concern about the substantive reliability of hearsay statements.

For example, the majority points to *United States v. Weston*, 448 F.2d 626 (9th Cir. 1971), as "stand[ing] for the proposition that if the sentencing process effectively puts the burden of proof on the defendant to refute a damaging hearsay allegation, particularly when the factual basis for believing such a charge is practically nonexistent, that process is legally flawed." Majority op. 23. But, as the majority acknowledges, the *reason* we were concerned about putting the burden on the defendant in *Weston* to refute the hearsay statements in the presentence report is that we doubted the statements' substantive reliability: "the factual basis for believing the charge was almost nil." 448 F.2d at 633. In other words, the government had failed to produce substantive indicia of reliability to support the hearsay statements, instead leaving it to the defendant to refute them. We vacated the sentence and forbid the district court from relying on the presentence report on resentencing "unless" the government "amplified [it] by information such as to be persuasive of the validity of the charge there made"—i.e., unless the government produced substantive indicia of reliability. *Id.* at 634. We did not suggest that reviewing the sentencing hearing but applying the correct burden of proof would suffice.

The majority proposes a single example of a case in which we relied on "procedural reliability" alone to approve the district court's reliance on hearsay statements at sentencing: *United States v. Petty*, 982 F.2d 1365 (9th Cir. 1993). Majority op. 24–25, 35–36. But in *Petty*, we did not discuss procedural protections at all.

*Petty* concluded that the district court "did not abuse its discretion in concluding that the [hearsay] Statement, when viewed in light of the corroborating evidence [introduced by the government], was sufficiently reliable." 982 F.2d at 1369. The extrinsic evidence included trial testimony, post-arrest admissions by codefendants, and "tape recorded admissions of . . . one of the defendants." *Id.*

The majority suggests that "the external corroborating evidence considered by the district court in *Petty* was evidence that the defendants could have attempted to impeach via cross-examination in the normal course of the hearing." Majority op. at 25. Thus, the majority concludes, the hearsay statements were "procedurally reliable." *Id.* at 35–36.

Although it does appear that in *Petty* the defendants had an opportunity to test *some* of the extrinsic evidence by cross-examination (such as the trial testimony), we did not rely on that circumstance to decide the case. Instead, we concluded, albeit with scant reasoning, that the extrinsic evidence "corroborat[ed]" the hearsay statements "sufficiently" to establish their substantive reliability, or at least that the district court did not err in so finding. 982 F.2d at 1369. If we had concluded that the extrinsic evidence did *not* corroborate the hearsay statements (as Judge Noonan, in dissent, suggested it did not, 982 F.2d at 1372), I do not see how we could have deemed the hearsay statements reliable,

regardless whether the extrinsic evidence was subject to cross-examination.

It may well be true that we are *more likely* to accept a hearsay statement as substantively reliable if the government introduces corroborating evidence that is subject to cross-examination. But I read our cases as consistently requiring at least some indicium of substantive reliability before a hearsay statement may form the basis of a sentence. Procedural protections—such as the ability to cross-examine evidence the government introduces to corroborate hearsay—are a useful adjunct, but cannot alone establish the reliability of a hearsay statement.

## II

I agree with the majority that substantive reliability is an essentially factual issue that we review for clear error. Majority op. 36–37. Here, although there may be a procedural dimension to our inquiry, *see id.* at 37–40, the questions whether Hiler's and Pitsch's statements corroborate each other, and whether the note purportedly from Franklin corroborates any of the statements, are essentially factual questions. Although I view the questions as close, I cannot say that the district court clearly erred in finding the statements sufficiently corroborated to be reliable.

Hiler's and Pitsch's statements were different from each other: Hiler said that Franklin sent him a note asking him to testify to specific facts, while Pitsch said that Franklin warned him that what he said "would be on paper, and that he should be careful." Hiler also said that after he shared Franklin's note with the government, he was assaulted by two other inmates who told him that Franklin had told them to "slap [him] around."

On their own, these statements are only partly corroborative of each other. But as the majority explains, they are at least somewhat consistent in that they "shared the common premise that Mr. Franklin had a consistent underlying motivation: that he wanted no one to testify contrary to his statements at [his first] plea hearing." Majority op. 40.

The note purportedly from Franklin is corroborative of Hiler's first statement and of Pitsch's statement. According to Hiler, the note referred to Pitsch as "Curly." For example, the note asked Hiler to testify to the fact that "Curly had his own peice [sic] and I had nothing to do with it." The note also says, "I know you said nothing against my best interest and it was Son and Curly that was squaking [sic] like birds." The note's suggestion that its author believed Pitsch had implicated Franklin but Hiler had not provides an explanation for why Franklin would ask Hiler to testify to specific facts, but would simply warn Pitsch to watch what he said.

As the majority explains, the fact that Franklin had an opportunity to challenge the note at his sentencing hearing increases its value as corroborating evidence. Majority op. 39. Franklin could have attempted to prove that he was not the author of the note in various ways—for example, through a handwriting analysis—but he did not.

Given that Hiler's and Pitsch's statements were at least somewhat corroborative of each other, that the note was corroborative of both men's statements, and that "Franklin had a full and fair opportunity to challenge the premise that he was the source of the note," Majority op. 39, I cannot say that the district court clearly erred in finding that Hiler's and Pitsch's statements bore adequate indicia of reliability to

supply the basis for an obstruction-of-justice enhancement. I therefore concur in the judgment.